**Tammy A. RICE, Plaintiff,**

v.

**COMMISSIONER OF SOCIAL SECURITY, Defendant.**

No. 6:14–CV–6452 EAW.

United States District Court, W.D. New York.

Signed July 21, 2015.

Tammy A. Rice, Corning, NY, pro se.

Monika Crawford, Social Security Administration, New York, NY, Kathryn L. Smith, U.S. Attorney's Office, Rochester, NY, for Defendant.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, District Judge.

### I. INTRODUCTION

*Pro se* plaintiff Tammy Rice ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g),. seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying Plaintiffs

application for disability benefits. (Dkt. 1). Presently before the Court is the Commissioner's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 13). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with the applicable legal standards. As a result, judgment is entered in favor of the Commissioner and Plaintiffs complaint is dismissed.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Overview

On April 15, 2011, Plaintiff filed an application for disability insurance benefits, alleging disability since January 26, 2011. (Transcript of Administrative Record (hereinafter "Tr.") at 144–52). Plaintiff's initial request for SSD was denied on June 29, 2010. (Tr. 85–90). Plaintiff timely requested a hearing and appeared, represented by counsel, to testify at the hearing held on October 12, 2012, before Administrative Law Judge ("ALJ") Edward I. Pitts. (Tr. 23–72).

On November 27, 2012, the ALJ issued a decision determining that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 9–17). The Appeals Council denied review on June 13, 2014, and the ALJ's decision became the final decision of the Commissioner. (Tr. 1–4). Plaintiff then filed this action on July 31, 2014. (Dkt. 1).

1. The Court received records via facsimile dated February 3, 2015, and April 15, 2015, purportedly from Plaintiffs healthcare providers, discussing Plaintiffs alleged impairments. These records are not part of the administrative record. As a result, the Court has not considered these medical records as they are not part of the administrative record and relate to recent treatment of Plaintiff. *See*

### B. Non–Medical Evidence

At the time of the ALJ's decision, Plaintiff was a 42–year–old female with a high school education. (Tr. 28, 181). Plaintiff had previously worked as a bus monitor and cafeteria monitor for the Corning County School District. (Tr. 28–29). Plaintiff testified that she injured her knees and aggravated an old back injury during a performance test on January 26, 2011, that prevented her from performing the lifting, walking, and stair climbing required by her job. (Tr. 34–35).

Plaintiff testified that her most disabling impairments were her back and knee impairments. (Tr. 49). She stated that she had other medical issues, but acknowledged that those did not prevent her from working. (Tr. 44–47). Plaintiff claimed that she was unable to engage in many activities because of her pain. (Tr. 48). Plaintiff indicated that she needed a cane to walk and would also use a walker or scooter to help her ambulate. (Tr. 44–47).

Plaintiff stated that she could care for her personal needs but required up to three hours to shower and dress herself. (Tr. 53–56). Plaintiff testified that she spent the majority of her day in a seated position, but would alternate between standing, lying down, and sitting during the day. (Tr. 59). Plaintiff claimed that she could only lift two pounds and could not bend to lift something from the floor. (Tr. 66).

### C. Summary of the Medical Evidence

The Court assumes the parties' familiarity with the medical record, which is summarized below.[1]

*Chubbuck v. Astrue*, No. 3:10CV1689(WWE), 2011 WL 2446308, at *1 (D.Conn. June 17, 2011) ("because the district court acts as an appellate court and not a trier of fact in social security cases, it may not consider evidence outside of the administrative record in reviewing a claim for benefits") (quotation omitted).

On January 20, 2011, Plaintiff treated with physician's assistant ("PA") Kimberly Ryan for complaints of knee pain. (Tr. 239–40). Plaintiff reported that she had slipped on ice and fell at work several years earlier that caused persisting pain and swelling. (Tr. 239). PA Ryan found mild swelling in the right knee and lower leg and minimal swelling in the left knee. (Tr. 241). Plaintiff indicated that she did not want to try injections or prescription medications, but rather preferred to start taking glucosamine supplements and participate in physical therapy. (*Id.*).

On January 27, 2011, Plaintiff visited Dr. Khalid Manzoor with complaints of left calf pain, indicating that she had injured herself at work the day before. (Tr. 312). Plaintiff informed Dr. Manzoor that she had injured her right knee approximately five to seven years earlier but had not had her knee examined at the time. (*Id.*). Dr. Manzoor examined Plaintiff and identified mild swelling in the right knee only with full range of motion in both knees. (*Id.*).

Plaintiff visited Dr. Manzoor again on January 31, 2011, with complaints of knee and back pain. (Tr. 309). Plaintiff claimed that her pain worsened with walking. (*Id.*). Dr. Manzoor identified mild swelling in the right knee and prescribed ibuprofen for Plaintiffs pain. (Tr. 310).

On February 8, 2011, Plaintiff visited Dr. Peter Remec with complaints of knee pain. (Tr. 362–63). Plaintiff claimed that she had a history of knee problems due to prior work injuries. (Tr. 362). Dr. Remec noted that Plaintiff walked without a limp or external support. (*Id.*). After conducting a physical examination, Dr. Remec opined that Plaintiff's symptomology was likely a result of deconditioning, and that her increase in symptoms was likely due to engaging in exertion with which Plaintiff was not accustomed. (*Id.*). Dr. Remec recommended that Plaintiff continue to take ibuprofen and prescribed physical therapy. (*Id.*). Dr. Remec opined that Plaintiff had a mild temporary disability and could engage in work activities that did not involve squatting, kneeling, or lifting more than 25 pounds. (Tr. 362).

Plaintiff returned to Dr. Manzoor on February 24, 2011, reporting back pain rated 4 out of 10 that worsened with bending. (Tr. 307). Dr. Manzoor noted mild tenderness on palpation in the spinal and paraspinal areas, but Plaintiff's range of motion was intact. (Tr. 308). Dr. Manzoor advised Plaintiff to continue taking Motrin and Tylenol PM. (*Id*).

On March 4, 2011, Plaintiff visited Dr. Kenneth Subin with complaints of bilateral knee pain. (Tr. 302). Plaintiff told Dr. Subin that she had injured her knee on January 26, 2011, during a performance test for a bus monitor position. (*Id.*). Plaintiff claimed that her pain was 6 out of 10 in severity and was worsened by walking, lifting, standing, climbing stairs, or squatting. (*Id.*). Plaintiff stated that she took 400 mg of ibuprofen three or four times per week, and that the ibuprofen as well as rest and ice helped alleviate her pain. (*Id.*). Dr. Subin noted that Plaintiffs medical history reported a "long history of knee problems" despite Plaintiff's claims that her knee pain was the result of a recent injury. (*Id.*). Dr. Subin found no evidence of muscle atrophy in either knee, but noted that Plaintiff was tender to palpation and had limited flexion in her knees. (Tr. 303–04). Plaintiff had a guarded gait and was unable to squat. (Tr. 304). Dr. Subin noted that a recent x-ray showed no abnormalities and that Plaintiff's physical therapy notes reflected that Plaintiff had a poor tolerance for therapy and had not made any significant progress. (*Id.*). Dr. Subin ordered magnetic resonance imaging ("MRI") studies of both of Plaintiff's knees and advised Plaintiff to continue to apply ice and take ibuprofen as needed.

(Tr. 305). Dr. Subin opined that Plaintiff did not require vocational rehabilitation services. (*Id.*).

On March 15, 2011, Dr. Manzoor noted diffuse tenderness to palpation to Plaintiff's back, but intact range of motion. (Tr. 297). Plaintiff reported mild to moderate pain in her lower back and left calf. (Tr. 300). Dr. Manzoor recommended that Plaintiff take Tylenol and ibuprofen as needed. (Tr. 301).

Plaintiff had a follow-up appointment with Dr. Subin on April 4, 2011. (Tr. 297). Plaintiff walked with a limp favoring her right side. (*Id.*). Dr. Subin noted that he tried to clarify the history of Plaintiff's knee pain, but that Plaintiff made inconsistent statements or claimed that she did not remember. (Tr. 297, 299). Plaintiff claimed that her knee condition had worsened since her last visit. (Tr. 297). Flexion was limited to 20 degrees in both knees but extension was within normal limits. (Tr. 298). Dr. Subin opined that Plaintiff could return to work with activity restrictions. (Tr. 299).

MRIs of Plaintiff's knees conducted on April 20, 2014, revealed mild chondromalacia patella changes in the right knee with small joint effusion in the left knee. (Tr. 316–17).

On May 6, 2011, Plaintiff was examined by Dr. Shakeel Durrani for complaints of back and knee pain. (Tr. 320–21). Dr. Durrani observed that Plaintiff ambulated without assistive devices, could stand on her heels and toes, and had full range of motion in her hips. (Tr. 321). Dr. Durrani reviewed x-rays of Plaintiff's lumbar spine and noted that they revealed mild degenerative changes in the lower part of the lumbar spine. (*Id.*). Dr. Durrani recommended that Plaintiff continue to work with "light medium duty," and lift no more than 25 pounds. (*Id.*).

Plaintiff treated with Dr. Michael Lax on May 11, 2011, in connection with her complaints related to her alleged injuries sustained during the bus monitor physical performance testing on January 26, 2011. (Tr. 369). Plaintiff reported pain in her spine, right thumb, wrist, and knees. (*Id.*). Plaintiff demonstrated a slightly decreased range of motion in her cervical spine with tenderness and spasm on palpation. (Tr. 370). Plaintiff had mild edema and pain on palpation of the knees. (*Id.*). Dr. Lax identified tender points at the ankles, knees, hips, upper chest wall, and upper and mid back. (Tr. 371). Dr. Lax diagnosed bilateral knee pain and fibromyalgia. (*Id.*). Dr. Lax opined that Plaintiff had 100% impairment and was unable to work due to widespread pain. (*Id.*).

On June 27, 2011, Plaintiff met with consultative examiner Dr. Sandra Boehlert. (Tr. 324–27). Plaintiff reported neck pain since 2009, low back pain since January 2011, and knee pain since January 2011. (Tr. 324). Plaintiff further reported that she cooked three times per week, did laundry two times per week, shopped two times per week, and showered and dressed herself daily. (Tr. 325). Dr. Boehlert noted that Plaintiff was using a cane, but that the cane was not medically necessary. (Tr. 326). Dr. Boehlert opined that Plaintiff had a mild limitation for: heavy ambulation, ambulation on uneven ground, heavy exertion in the standing position, bending sustained in the lumbar spine, bending and twisting of the neck, and repetitive pushing or pulling. (Tr. 327).

On June 29, 2011, Plaintiff treated with Dr. Lax for aching in her knees, neck, and back. (Tr. 378). Plaintiff reported that she took 400 mg of ibuprofen a "couple" times per day and the medication helped with her pain. (*Id.*). Plaintiff walked with a cane and displayed difficulty rising from her chair and getting on and off the examination table. (*Id.*). Plaintiff had a

marked decrease in extension in the cervical spine and moderate decrease in lateral flexion to the right and mild decrease in lateral flexion to the left. (Tr. 379). Dr. Lax diagnosed cervicothoracic strain, knee pain with chondromalacia patella, and low back pain. (*Id.*).

Plaintiff visited Dr. Lax again on August 17, 2011, complaining of low back pain. (Tr. 384). Plaintiff reported difficulty falling asleep, but noted some pain relief with the use of a heating pad and low-dose ibuprofen. (*Id.*). Plaintiff reported difficulty lifting anything over five pounds, and noted that she had trouble getting on and off the toilet. (*Id.*). Plaintiff reported a pain level of 5 out of 10 in intensity, and claimed that she could walk for 25 feet before needing to rest, sit in one position for 20–30 minutes at a time, and stand for 10–15 minutes at a time. (*Id.*). Plaintiff showed pain on palpation in the knees, mild edema, and crepitus in the left knee. (*Id.*). Dr. Lax prescribed Plaintiff a walker with a seat and opined that Plaintiff was unable to work in any capacity. (Tr. 385).

At a follow-up appointment with Dr. Lax on October 12, 2011, Plaintiff reported continued low back pain. (Tr. 388). Plaintiff used a heating pad and two extra-strength Tylenol to treat her pain. (*Id.*). Plaintiff had a decreased range of motion in the lumbar and cervical spine with pain on palpation. (Tr. 389). Dr. Lax noted that Plaintiff's knees were tender, but there was no effusion or instability. (*Id.*). Plaintiff reported tenderness in her right wrist, and Dr. Lax recommended evaluation by a rheumatologist. (*Id.*). Dr. Lax opined that Plaintiff was unable to work in any capacity. (*Id.*).

November 25, 2011 x-rays of Plaintiff's bilateral wrists and hands revealed no abnormalities. (Tr. 342–44).

On February 1, 2012, Plaintiff treated with Dr. Lax, reporting back pain, neck and shoulder pain, wrist pain and tingling, and knee pain. (Tr. 393). Plaintiff reported that she engaged in self-care, but needed extra time. (*Id.*). Plaintiff used a walker and wore a back support belt when ambulating. (Tr. 394). On examination, Plaintiff had tenderness in the right wrist, but no swelling. (*Id.*). Plaintiff had bony tenderness in both knees, but no swelling, effusion, or erythema. (*Id.*). Dr. Lax reported that range of motion was markedly decreased in all directions in the lumbar spine. (*Id.*). Plaintiff had normal motor strength in her arms and legs. (Tr. 395). Dr. Lax advised Plaintiff to continue limiting activities as tolerated, and opined that Plaintiff was unable to work in any capacity. (*Id.*).

Dr. Lax drafted a medical source statement dated February 8, 2012. (Tr. 334–41). He diagnosed low back pain, cervical pain, DeQuervian's tenosynovitis, and chondromalacia of the knee. (Tr. 334). Dr. Lax assigned Plaintiff a poor prognosis and indicated that Plaintiff could not walk or lift any weight. (Tr. 336–37). Dr. Lax opined that Plaintiff could not work in any capacity. (Tr. 337).

On May 16, 2012, Plaintiff attended a follow-up appointment with Dr. Lax. (Tr. 396). Plaintiff reported that she received water therapy five or six times per week, and that the therapy was helpful in reducing her pain and increasing her level of function. (*Id.*). Plaintiff complained of weakness on both of her arms with intermittent numbness in her hips, neck, and lumbar spine. (Tr. 397). Plaintiff demonstrated tenderness to palpation in the mid to low back, limited range of motion in the cervical and lumbar spine, positive straight leg raising, decreased upper and lower extremity strength, and an abnormal gait. (Tr. 397–98).

Dr. Lax completed a second medical source statement on June 19, 2012. (Tr. 399–403). He noted that Plaintiff could

not perform any lifting, bending, twisting, or carrying. (Tr. 399). He stated that Plaintiff could occasionally perform simple grasping and fine manipulation and occasionally reach, push, and pull. (Tr. 400). Dr. Lax indicated that Plaintiff could occasionally knee and climb stairs, and sit, stand, and walk less than two hours each in an eight-hour workday. (Tr. 401). He further noted that Plaintiff could sit, stand, and walk only 0–15 minutes at a time before needing to change positions. (*Id.*). Dr. Lax opined that Plaintiff could tolerate moderate stress, but that her pain constantly interfered with her attention and concentration. (Tr. 402). Dr. Lax indicated that Plaintiff needed to avoid all exposure to heights, moving machinery, chemicals, fumes, and vibrations, and avoid significant exposure to humidity, dust, and temperature extremes. (*Id.*). Dr. Lax concluded that Plaintiff was unable to work in any capacity. (Tr. 403).

On August 8, 2012, Plaintiff treated with a nurse practitioner at Dr. Lax's office for her neck and back pain. (Tr. 404–06). Plaintiff used a walker and four-point cane, and demonstrated difficulty walking and getting up from a chair. (Tr. 405). Plaintiff's neck was tender, and Plaintiff demonstrated a reduced range of motion in her shoulders, cervical spine, and lumbar spine. (*Id.*). The nurse practitioner noted that Plaintiff's workers' compensation cases were still on appeal with the carrier. (Tr. 406).

On November 7, 2012, Plaintiff informed a nurse practitioner at Dr. Lax's office that she was experiencing pain that was rated 10 out of 10 in severity. (Tr. 427). Plaintiff claimed that analgesics, home exercises, and heat had failed to provide relief for her pain. (*Id.*). On examination, Plaintiff was very tender to light palpation on her trunk and limbs. (Tr. 428). Plaintiff had decreased range of motion in her shoulders, knees, neck, and back. (Tr. 428–29).

At a follow-up appointment on November 7, 2012, Plaintiff reported no improvement in her symptoms. (Tr. 427–28). The nurse practitioner noted that Plaintiff's case with respect to her back injury had been accepted by the workers' compensation carrier. (Tr. 429).

## III. DISCUSSION

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, the Court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing.'" *Emerson v. Comm'r of Soc. Sec.*, No. 12 Civ. 6451(PAC)(SN), 2014 WL 1265918, at *9 (S.D.N.Y. Mar. 27, 2014) (quoting 42 U.S.C. § 405(g)). 42 U.S.C. § 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987).

Therefore, the scope of the Court's review is limited to determining whether the Commissioner applied the ap-

propriate legal standards in evaluating the plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence in the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.1983) (stating that a reviewing Court does not examine a benefits case *de novo* ). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46–47 (2d Cir.1996).

 Judgment on the pleadings may be granted under Rule 12(c) where the "material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir.1988).

### B. Determining Disability Under the Social Security Act

The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rembert v. Colvin*, No. 13–CV–638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

 The burden is on the claimant to demonstrate that she is disabled within the meaning of the Act. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir.2002). The individual will only be declared disabled if

her impairment is of such severity that she is unable to do her previous work and cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The following five steps are followed:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir.2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

### C. Summary of ALJ's Determination

In applying the five-step sequential evaluation in this matter, ALJ Pitts made the following determinations. At step one, the ALJ found that Plaintiff was not engaged in substantial gainful activity during the relevant timeframe. (Tr. 11). At step two, the ALJ determined that Plaintiff had severe impairments of mild degenerative disc disease of the lumbar spine and mild degenerative joint disease of the knees. (*Id.*). ALJ Pitts noted that Plaintiff alleged additional impairments including neck, wrist, and thumb pain, allergies, eczema, rosacea, a history of head injury, and depression, but found that these impairments were not severe because they did not cause more than minimal limitations on Plaintiff's ability to perform basic work activities. (Tr. 11–12). The ALJ concluded, at step three, that Plaintiff did not meet or equal any listed impairment. (Tr. 13). At step four, the ALJ evaluated Plaintiff's residual functional capacity ("RFC") and found that Plaintiff could:

> [P]erform light work as defined in 20 CFR 404.1567(b) except the claimant can only occasionally ambulate on uneven ground and would need a cane to do so. She can stand/walk in combination for two hours during an eight-hour workday and can sit for forty-five minutes at a time for a total of six hours in an eight-hour workday. The claimant can occasionally climb ramps, stairs, ladders, ropes and scaffolds; balance, stoop, kneel, crouch and crawl. These limitations are equivalent to at least the full range of sedentary work.

(*Id.*). The ALJ also determined at step four that Plaintiff could not perform her past relevant work. (Tr. 16). At step five, the ALJ ultimately concluded that Plaintiff

was not disabled or entitled to disability insurance benefits. (Tr. 16–17).

### D. Plaintiff's Objections

Construing Plaintiff's objections liberally, Plaintiff seems to assert two main complaints concerning ALJ Pitts' decision: (1) the ALJ's reliance on the opinions of Dr. Boehlert, Dr. Durrani, and Dr. Remec; and (2) the basis of the ALJ's decision being "previous" medical issues and not "current" ones. (Dkt. 15). The Commissioner maintains that ALJ Pitts' determination was supported by substantial evidence using the proper legal analysis. (Dkt. 16).

#### 1. The ALJ's Reliance on the Opinions of Dr. Remec, Dr. Durrani, and Dr. Subin

Plaintiff argues that she was not provided a "fair hearing" because ALJ Pitts relied on the opinions of physicians who only examined her one or a few times. (Dkt. 15 at 1). Plaintiff claims that Dr. Remec only talked with Plaintiff for "5 or 6 minutes" with respect to Plaintiff's knee problems and informed Plaintiff that nothing could be done for her knees. (*Id.*). Plaintiff alleges that Dr. Durrani only consulted with Plaintiff for approximately 10 minutes with respect to the results of Plaintiff's back x-ray. (*Id.*). Plaintiff claims that Dr. Durrani informed Plaintiff that she had degenerative disc disease, told her that nothing could be done to correct it, and advised Plaintiff to use heat and ice on her back and take Tylenol or ibuprofen to relieve her pain. (*Id.*). Plaintiff notes that she only saw Dr. Subin "a couple of different times" for her knees, and claims that Dr. Subin "tried to confuse" her by discussing preexisting conditions with her knees. (*Id.*). Plaintiff argues that Dr. Subin did not help her and referred her to Dr. Remec. (*Id.*). In contrast, Plaintiff contends that she has seen Dr. Lax "for

every issue, injury, or disease symptom" (*Id.*).

■ To the extent that Plaintiff contends that the opinions of these doctors are "old," this argument is rejected because the opinions are dated within the relevant time frame for Plaintiff's application. On April 15, 2011, Plaintiff filed an application for disability insurance benefits, alleging disability since January 26, 2011. (Tr. 144–52). Plaintiff visited Dr. Remec in February 2011, Dr. Durrani examined Plaintiff in May 2011, and Dr. Subin treated Plaintiff in March and April 2011. As a result, these examinations were conducted within the relevant time period for Plaintiff's application, and ALJ Pitts was permitted to consider the examinations as part of the record.

■ As for Plaintiff's contention that ALJ Pitts should not have considered the opinions of doctors who only examined her one or a few times over her treating physician, Dr. Lax, this contention fails under the facts and circumstances of this case.

■ Treating physicians "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations...." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The "treating physician rule" requires the ALJ to give "controlling weight" to the opinion of a claimant's treating physician regarding "the nature and severity of [the claimant's] impairment(s) ... [if it] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). As explained by the Second Circuit Court of Appeals;

> An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various "factors" to determine how much weight

to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004). An ALJ does not have to explicitly walk through these factors, so long as the Court can "conclude that the ALJ applied the substance of the treating physician rule ... and provide[d] 'good reasons' for the weight she gives to the treating source's opinion." *Id.*

■ "Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, ... the opinion of the treating physician is not afforded controlling weight where .... the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Id.*

Here, ALJ Pitts determined that Dr. Lax's opinion was unsupported by the doctor's own objective findings and was inconsistent with the relatively conservative treatment of Plaintiff's physical complaints. (Tr. 15). This finding was made in accordance with the applicable legal standards.

As the ALJ noted, Plaintiff was not on a pain management regimen, she was not prescribed pain medication, and she received little specialized orthopedic treatment for her alleged pain. (Tr. 14). In addition, objective medical evidence revealed minimal to no physical damage to Plaintiff's knees, back, hands, or wrists. (Tr. 304, 316–17, 342–44). These findings

are inconsistent with Dr. Lax's opinion that Plaintiff was incapable of performing any work.[2]

By contrast, Dr. Durrani and Dr. Rémec, while apparently not treating physicians, found that Plaintiff's orthopedic problems were muscular in nature. (Tr. 320–21, 362–63). They opined that Plaintiff had physical limitations, but that these limitations were not disabling insofar as Plaintiff could perform work in the light to medium range. (Id.). Dr. Subin, who was apparently a treating physician, also opined that although Plaintiff had a history of knee injury, she could return to work with activity restrictions. (Tr. 299). These findings are consistent with the objective medical evidence and are supported by the record.

■ "[T]he opinions of consulting sources 'may constitute substantial evidence if they are consistent with the record as a whole.'" Smith v. Colvin, 17 F.Supp.3d 260, 268 (W.D.N.Y.2014) (quoting Barringer v. Comm'r of Soc. Sec., 358 F.Supp.2d 67, 79 (N.D.N.Y.2005)). "This is particularly so where the consultant directly examines the applicant." Id.; see also Gray v. Astrue, No. 09–CV–00584, 2011 WL 2516496, at *5 (W.D.N.Y. June 23, 2011) (noting the report of a non-treating source may constitute substantial evidence when it is consistent with other evidence in the record). Accordingly, ALJ Pitts was permitted to assign greater weight to the opinions of consulting doctors Durrani and Remec and treating physician Subin, and less weight to the unsupported opinion of Dr. Lax, although he was one of Plaintiffs treating physicians.

**2. Worsening of Plaintiff's Condition or Development of New Impairments**

■ Plaintiff objects to ALJ Pitts considering "previous and old Drs[sic] Opinions" because she claims that her condition has "worsened considerably" and her strength "has decreased." (Dkt. 15 at 2). Plaintiff notes that she is now engaged in physical therapy and treats with a therapist and other service agencies for mental health issues. (Id.). Plaintiff claims that she has developed allergies to shampoos, lotions, sunscreen, antibiotics, and other medications as well as the sun. (Id. at 3).

The administrative record does not contain medical records to indicate that these impairments were present or were significant enough to impact Plaintiff's ability to work during the relevant time period. At this point, the role of the Court is to consider the ALJ's determination based on the record before him as it related to the relevant time period. See Petty v. Colvin, No. 12 Civ. 1644, 2014 WL 2465109, at *2 (S.D.N.Y. June 2, 2014) ("Plaintiff's proffer that her condition has worsened since the Commissioner's determination is immaterial because it concerns events after the Commissioner's decision to deny her benefits."). If Plaintiff's condition has worsened to the point where Plaintiff believes she is presently disabled, then she may file

---

2. The Court notes that Dr. Lax's opinions appear to have been supplied in support of Plaintiff's application for workers' compensation benefits. "Workers' compensation determinations are directed to the worker's prior employment and measure the ability to perform that employment rather than using the definition of disability in the Social Security Act." Gray v. Chater, 903 F.Supp. 293, 301 n. 8 (N.D.N.Y.1995). As a result, Dr. Lax's opinions for workers' compensation purposes that Plaintiff was unable to perform any work were not binding on the ALJ in formulating his RFC. See Kara v. Apfel, 11 F.Supp.2d 375, 380 (S.D.N.Y.1998) (noting a doctor's finding that plaintiff was totally disabled for workers' compensation claim was not binding on the Commissioner because of the differences in the definitions of disability); Acevedo v. Colvin, 20 F.Supp.3d 377, 387 n. 7 (W.D.N.Y. 2014) (same).

a new application for benefits. *See Rosario v. Colvin,* No. 13–CV–5573, 2015 WL 3862683, at *13 n. 8 (E.D.N.Y. June 22, 2015) ("Once again, if Plaintiff's condition has worsened, she can file a new claim with the SSA.") (citing 20 C.F.R. § 404.620(a)(2)); *Camacho v. Comm'r of Soc. Sec.,* No. 04 Civ.2006(FB), 2005 WL 3333468, at *4 (E.D.N.Y. Dec. 6, 2005) ("[Plaintiff] is, of course, free to reapply for benefits based on conditions that have developed or worsened since the ALJ rendered his decision.").

## IV. CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt. 13) is granted. Plaintiff's complaint is dismissed with prejudice.

SO ORDERED.